Mr. Moore, we'll hear from you. Thank you, Your Honor. May it please the Court, I'm John Moore, counsel for the appellants Diamond Falls Estates, Shirley M. Boiffo and Charles K. Boiffo. Your Honor, this is a lender liability action against Nantahala Bank & Trust Company concerning a real estate development made by the bank to Diamond Falls Estates for the purpose of developing a residential subdivision called Diamond Falls Estates which is located in Franklin, North Carolina. The appellant Shirley and Charles Boiffo guaranteed that loan. On the lower court level, Nantahala Bank filed a counter claim against the appellants for breach of the promissory note and the related guarantees. The district court resolved all claims in favor of the bank on summary judgment. We submit that breach of contract claim, their fiduciary misrepresentation claim, or their breach of fiduciary duty claim, constructive fraud claim, or unfair and deceptive trade practices claim. And I'll first start, Your Honors, with the breach of contract claim. Under appellant's breach of contract claim, I want to focus in on the portion of that claim that deals with improper loan disbursements.  That the bank made certain improper loan disbursements in bad faith which injured their rights to receive benefits under that development loan. Particularly, Your Honors, we allege, the appellants allege at the lower court that the bank's first made improper disbursements under the related note in amounts that grossly exceeded the budget that was used for the loan. In fact, the bank advanced approximately 1.5 million dollars over the agreed-upon budget. That's the first improper disbursement. It's also alleged in the breach of contract claim, Your Honors, that the bank made advances to certain field accounts in the aggregate amount of approximately $170,000 without requiring any kind of a backup documentation or invoices which we contend were required under promissory note. According to the bank, the loan officer, Mr. Hawkins, during his deposition testified that these field accounts were supposed to be used as a petty cash account containing no more than $5,000. Instead, the bank dispersed $170,000 for these field accounts with no documentation whatsoever. Your Honor, these disbursements, what provision of the Your Honor, we allege that... It seems to me these disbursements are usually the borrower wants disbursements to, and the bank usually holds back because it wants to be paid back. These monies are going to the development and the borrower submits some document to the bank to request the disbursements. And in this case, for instance, you have release prices. And the bank, every time you sell a piece of real estate, the bank keeps a certain proportion. I thought that was the centerpiece of your breach of contract claim. But they changed the release price from 95% to 85.5%. Your Honor, that is a part of it. Yeah, but I'm getting to the very fundamental question. These are all for the benefit of the borrower. All these changes are for the benefit of the borrower if they were indeed breaches. And the borrower can hardly claim, you didn't hold back enough for the payment of the loan. You gave me more money at the closing than I should have received. I don't quite understand your claim. Your Honor, the release provision is a separate issue. OK, stick with the disbursements then. OK. Well, Your Honor, we contend that there are actually two separate obligations under the promissory note, the actual promissory note itself, that the bank violated. The first one is that the bank, we feel that the bank was required to make sure that all advances were accompanied with any agreements, documents, and instruments required for the loan. Mr. Russell Hawkins, during his deposition at the lower court level, testified as to that. Secondly, Your Honors, the bank had a requirement to make advances under the loan based on requests that the bank reasonably believed to be genuine, and we're arguing that a $1.5 million in aggregate advances over the budget and advancing $170,000 to field accounts that were supposed to only contain $5,000 as a petty cash account could not have been made based on a reasonable belief that those advance requests were genuine. Well, it sounds like, Mr. Moore, you're saying the bank was obligated to manage this project because it made the loan. Your Honor, that's a whole separate issue. Isn't that what you're saying? Well, Your Honor, I'm sorry. The bank had a duty of oversight of the details of the project because it was the lender in this case, and I don't see that that is true. What gives them the duty to do any more than they did? I mean, where does the law impose a duty on them as a lender to do anything more than they did? You have two parts to your question, Your Honor. I'll address the law part first. The district court did rightfully recognize that under North Carolina law, which governs this case, that there is an implied covenant of good faith and fair dealing in every contract, and that covenant, Your Honor, is that neither party shall do anything that injures the right of the other party to receive the benefits under the agreement. That's part of our breach of contract claim. And so the bank did have an obligation to live up to that covenant, and we argue that they failed to do that by making over $1.5 million in advances in excess of the budget and in funding $170,000 for a petty cash account, which by the bank's own admission should have only contained $5,000. Your Honor, this project failed because of cost overages. And then, Your Honor, you asked me about the bank's duties. Because they didn't sell. That's really what it did. It was in a bad market. Everybody was having trouble. They got refinanced. They put up more money. They introduced more cash, and they couldn't make sales. They finally had that big sales event, and that helped some. Your Honor, that's what the... Your burden is a lot different, though, because you're focusing on a lender who puts up money for the development and now says that somehow there had to be some success with respect to the development when they lent the money or dispersed the money to the project. Your Honor, the bank would want you to believe that this project failed because the economy went bad, because they couldn't sell lots. Your Honor, this project failed before that even happened. The project failed because $1.5 million was advanced over and above the agreed-upon budget that was agreed to at the time the loan was made. And when you look at where the money went, Your Honors, that's what really gives... Who was that disbursement made to? It was an aggregate disbursement made to a lot of different people, and that's what I was about to get to, Your Honor, is that when you look at where the money went, that's what really should give pause is that we know that the first $2.75 million... This is a $4.8 million loan. The first $2.75 went to a company called Westridge. That's a company that's owned by a bank shareholder, the registered agent of which is on the board of directors for the bank. We know that money also went to certain contractors that had a direct relationship with the bank and the chairman of the bank. Payments went to the chairman himself. Payments went to his wife. Payments went to a company owned by the chairman's daughter and son-in-law. Payments went to a company called Vans Electric, which is a company owned by the chairman's son. Payments went to a company owned by the chairman called WhistleStop. So what are you saying, then, that the bank had a duty to police the people with whom they do office-to-business and determine whether there was any relationship or association of any entity, contractor, whatever, and then interfere and say, no, you can't, and offer money to them? Are you saying that was the relationship they had? I'm arguing that this was nothing more than a bunch-of-self deal. It was a loan made to my clients. And then the other part that I wanted to address, the question that you initially had for me, Your Honor, is why is there a fiduciary relationship? And that is because we're arguing that the project manager who was used to manage this project, a guy by the name of Steve Gravitt, the borrower was compelled to use Mr. Gravitt by the bank. The bank wasn't going to even make a... The district court didn't find that. There's evidence in the records, Your Honor, that shows that. If I lend you money as a bank, and I say, the only way we're going to do this is if the law firm of White & Case supervises every transaction, or we're not going to make the loan, that's not a fiduciary relationship. But, Your Honor, you've got to look at everything. So you have the compelled use of Mr. Gravitt. You've got Mr. Gravitt setting up, who's in complete control of the project, who sets up separate accounts... The bank interviewed him and decided to hire him, and didn't have to hire him. She could have rejected it. She said she liked him. She worked well with him. And later on, when she dismissed him, she congratulated him and said he did a nice job. I don't understand. You make it sound as if your client is just in a closet. Your client went out actively managing this whole project, borrowed the money, and accepted the recommendation of the bank to use Gravitt to manage the project, because the project was totally at odds. And she agreed. She also signed all these checks you're complaining about. You're complaining about the advances, but the Boafos signed them, and Diamond Falls approved all the advances made by the bank, or the Boafos wouldn't have signed them. So how can we find that the bank did anything wrong? Because, Your Honor, although the Boafos signed the checks, they did not have an opportunity to review all of the backup documentation and invoices that were provided by Mr. Gravitt to the bank for the advance. So a bank that makes a loan has got to do that kind of due diligence on every business? You're saying that they have to check the bona fides of every contractor who does business, the relationships? It seems to me that you're asking us to impose really an impossible burden. Why isn't your claim against Mr. Gravitt? Your Honor, I'll answer your question first. We did file a lawsuit against Mr. Gravitt. The problem with the lawsuit ultimately against Mr. Gravitt is that Mr. Gravitt and my clients, Your Honor, were up in age at the time that they did this. They also had a daughter who was a lawyer who was helping them. And then the daughter died, and so they were left kind of managing this by themselves. But we did file a lawsuit against Mr. Gravitt. What happened is that Mr. Gravitt convinced my clients to allow him to also become a member of Diamond Falls Estates LLC. After this sales event happened, I think Mr. Gravitt understood that he might have messed up as far as dispersing funds to people that probably shouldn't have gotten the money. And so he calls a member meeting with himself and the Waffles, and he convinces them to sign some minutes which ratify all of the actions that he had undertaken in connection with the loan. And that's what hurt him. Which, the way you described it, sounds like a new cause of action or two perhaps came into existence at that point. I don't understand, Your Honor. The way you just described it, they have a new claim against him for what? Misrepresentation? Fraud? I don't think so, Your Honor, because the way that these minutes read... She agrees with them all, too. She agrees with her claims. The way these minutes read, Your Honor, and Mr. Gravitt prepared the minutes... Well, that's what I'm saying. You're saying Gravitt did this, Gravitt did this, Gravitt took advantage of these elderly members of the LLC. The law provides for causes of action in that circumstance. Your Honor, I think he had some very good waiver and ratification arguments that really hurt my case. Fair enough. But the bank doesn't.  No, Your Honor, it doesn't. In other words, the bank lends the money, puts it to the project, and the project's mismanaged because of Gravitt. And you say Gravitt entered into an agreement with your client. Doesn't that end the case? Your Honor, it doesn't, because you've got to look at all the circumstances. Gravitt used a company called Luxor as the consultant project manager. Luxor is a bank shareholder, unbeknownst to my client at the time that they engaged Gravitt. The bank acquiesced... But what's that got to do with it? Because, Your Honor, the relationship between the shareholders and the bank chairman, they control the whole loan process. Except Luxor, you didn't control the bank. But he was a shareholder, Your Honor. He had the opportunity to vote for the chairman who controlled the entire loan process. So when you look at the circumstances in total, you've got a project manager who was used because my clients were compelled to use him by the chairman of the bank. This is a gentleman who requests advances from the bank on behalf of my client. Wasn't that stock held in some retirement account? It was a Luxor profit-sharing account. Profit-sharing account. They just held that as part of their asset. But, Your Honor, this is a company that's solely owned by one person, Mr. Gravitt. He had the right to vote on behalf of the Luxor profit-sharing... Well, it sounds to me that if there are some wrongs, maybe Gravitt committed a lot of wrongs. Maybe he didn't. And Judge Davis' question probes the question further that if he overborne them by some wrongdoing in the settlement, the waiver arguments, either she waived or she didn't waive. If she was forced to waive or misrepresented in waiving, the waivers are no good. But you're saying that she waived because she agreed to all of that. Only as to Gravitt, Judge. The bank is still responsible under its own terms under the promissory note. It was not supposed to advance monies that it didn't reasonably believe that the requests for those advances were genuine. And it was not supposed to advance monies without any backup documentation or supporting invoices. And they did that. And they advanced the monies to the bank's people who had a direct relationship with the bank, including the chairman himself, his family members, and all that. That's not right, Your Honors, especially when the monies that were dispersed exceeded the budget that was agreed upon initially by 1.5 million. Were these checks signed by your clients? Your Honor, yes, the Bluffos did sign blank checks. I just can't understand that. They trusted Mr. Gravitt. No, but you write a check. You intend to write the check and give it to somebody. Now, if you do it carelessly, you give it to a thief, the bank's not responsible. Your Honor, when you trust the project manager in the bank to fund the project appropriately... The bank funded the project in terms of allowing her to write the check. She wrote the bank loan money checks. And she has to decide when she writes. That's the ultimate control. I disagree, Your Honor. And what if the bank gave her the whole loan up front and said, you manage it, we have a security interest in the real estate, that's good enough for us. The only reason the bank disperses along the way is to secure repayment. But they could have dispersed the whole amount to her in the beginning and all of this money spent carelessly. The bank's not at fault for how it's spent. Your Honor, I disagree with you. I think they are because the bank compelled the use of the project manager and the bank acquiesced when the project manager... Thank you. Let me ask you this just before you sit down. Yes, Judge. What in particular did the district court do wrong? The court handled it very thoroughly in a lengthy opinion and considered all these facts and basically pointed to an absence of showing with respect to most of these facts. Where do you believe the court erred in its opinion? Thank you, Your Honor. I agree. The district court came out with a very lengthy, 55-page long opinion. But in essence, all that opinion says is that the appellants failed to produce any evidence whatsoever to support their claims. And that's not true, Your Honor. What particular statement were the court erred in that regard? In other words, give me just an example where the court said you failed to produce evidence and you in fact did. And if I can do that, can I do that with respect to each of the claims? There's a breach of contract claim, fiduciary duty claim, and a fraudulent misrepresentation claim. And I can point to specifically where the district court erred in his ruling with respect to each of those claims. And I can do it quickly. I can start with the breach of contract. Why don't you just as an example do the breach of contract? Take a minute. Okay, I've got it. So, Your Honor, the district court granted the bank summary judgment on the breach of contract claims on these grounds. The district court said that appellants authorized the draw request, which is not true. They might have signed the checks, but they did not authorize, they did not even have a chance to see all of the draw requests that were being presented by Mr. Gravitt to the bank. So that's not true. The district court said the appellants failed to produce any evidence suggesting that the bank had actual knowledge or willfully turned a blind eye to any improper actions of Mr. Gravitt, which is also not true. The bank funded $170,000 into a field account that the bank's own loan officer who handled this loan testified that that account was only supposed to contain $5,000 because it was a petty cash account. How can you fund $170,000 when you already know that the account is only supposed to contain $5,000? So we contradict that. And they said the bank did not have any contractual duty to the appellant. We disagree with that, Judge, because there are actually two obligations under the note. Again, there's an obligation to make sure that all advances have backup documentation invoices. That was not true with respect to the field account advances. And the note also says that for the bank to make advances that the bank has to reasonably believe that the request for the advances are genuine. How could the bank believe that a request for $170,000 into a petty cash account that was only supposed to contain $5,000, how could that be a genuine request? I think at a minimum there's a tribal issue effect on that issue. Thank you. All right. Ms. Manhattan. May it please the Court. My name is Esther Manheimer. I'm an attorney with the 28th Judicial District, Buncombe County Bar in North Carolina. And I represent Nantahala Bank and Trust. This case is about a community bank that entered into a commercial loan with borrowers who already were underway with a residential development in Macon County, North Carolina. The appellants would have you conclude that there are issues of fact that preclude this Court from upholding the District Court's grant of summary judgment as to all claims brought by the appellant. Why don't you let us address for just a moment on that the argument that Mr. Moore made with respect to the $170,000 field account. Tell me what word the District Court, why it got it right or why he's not right. Well, as a preliminary matter, a curious thing. The District Court carefully sifted through numerous allegations in dealing with this first claim. But the District Court concluded that the appellants didn't actually bring a breach of contract claim. That they only brought a breach of good faith and fair dealing claim. But the District Court went on to say we're going to deal with this breach of good faith and fair dealing claim. In the appellant's brief to this Court, they continued with a breach of contract claim. And in support of that breach of contract claim, they only refer to the release provision. They don't talk about improper disbursements. Now they do do that in the section regarding their attempt to establish that a fiduciary relationship exists in this case. They do not cover that in the breach of contract section of their brief. They only talk about the release provisions. So with regard to the release provisions under breach... I understand the release provisions. I think that doesn't get a very good start from his point of view. But his argument is that they funded accounts beyond which there was a pre-existing agreement to fund them. For instance, he said there was only I don't know quite how this field account where the money went, who cashed it, who signed the checks and so forth. But it seems to me that's one of his biggest complaints, at least here at oral argument. I agree in his brief it was the release amounts which seems to me that benefited him. They just changed from 95% of the net to 85.5% of the gross. And that is in there to protect the bank not to protect the client. With regard to the disbursements. So functionally you had it correct. The way this worked is there was a submission by Mr. Gravitt to the bank with all the receipts and the request for monies to be dispersed at each interval along the way during the construction of this development. And in those requests was also a request to fund a field account that Mr. Gravitt maintained separately at a separate bank. He had two different banks. The BWAFAs signed checks to pay all of these contractors and fund that field account. So this was dealt with exactly the same as the payments to all the contractors. So each time how much money went into this field account. But there would be a check signed by Mrs. BWAFA typically. It would be payable to this other bank as a cash deposit or checking deposit. But they were well aware of it because they're signing it as they're signing all these other checks. Now I noticed that Mr. Moore referred to blank checks but that is not the testimony in this case. That is not what's in evidence. These were checks prepared by Mr. Gravitt and then Mrs. BWAFA would sign them. Typically Mrs. BWAFA. Sometimes it was I believe Althea when she was still alive. But it was handled the same way. Now there was much made of the testimony of the bank officer who did most of the interacting with Mr. Gravitt. Mr. Russell that is. Interacted with Mr. Gravitt and apparently there was some kind of understanding that there would be smaller amounts in this field account and there was some question on the part of the opponents about how come larger amounts. Was that a note? The terms within the note don't address these minutia. These specifics of the mechanics of how they handled the monies. But the function was the same in the sense that each check was signed by the BWAFA's including the checks to sign this field account periodically. Was the minutia covered anywhere in writing? As between the bank and the borrowers. Among the borrowers. That is Mr. Gravitt and Diamond Falls. Well you'll see in the record we do have their contract so we are aware of the scope of the work. Scope of the work. But the minutia about the field accounts which bank. Not that I When are you going to sign checks? All that was just That was handled Yes. And the full amount of this loan was paid out over the course of the loan and all the monies went into this development as you can see. Does that answer your question on the disbursements? So turning to the breach of contract it looks like we've covered the release provisions. This is a curious challenge in this case because the release provisions appear to be for the protection of the bank. They're trying to make sure they're maintaining What is the difference between 95% of net or 85.5 of gross? Is that roughly the same number? Yes as I understand it the reason for the change was because the first formula required that the bank officer tried to estimate the amount needed at closing and the first and only closing that hired prior to this big event sale that happened in October 2010 it turned out the estimate was wrong. So it wasn't working well and they needed a formula where they could actually know what the release amount was going to be. So they changed it to 85.5% which facilitates the disbursement without calculating the net. Correct. Right. And again this is a provision there to protect the bank so that the bank is maintaining a lien on collateral that is making sure the loan to value ratio is held in compliance with banking regulations. And so that's the purpose of it. But obviously we had a sliding economy here. Things were not working out well. These are second home sites. Are these settled like hot cakes today? No. Not yet. Not yet. Is this in recreational country? Is it near the mountains? Yes. Franklin is a small town in western North Carolina and this is very much a tourism area. What's the status of the development now? It is still there. You can read in the deposition of Mrs. Waffo it's a very nice subdivision and it has a clubhouse and what not. It is still there. The bank has not foreclosed it. As you may know there's a bankruptcy case. What percentage of the units are sold? Phase 1 and Phase 2 are where the units have sold. There's quite a bit of raw land still left undeveloped in that. It was a very large development. Maybe 260 acres. They undertook a major first time raw land deal, didn't they? They did. Mrs. Waffo does have an extensive background in business management. She managed her husband's cardiology practice and had bought land before but had never embarked on a residential development as such. The other concern that I would point the court to is the issue of whether or not there was a fiduciary relationship in this situation. This was alluded to earlier. In North Carolina we have obviously contractual fiduciary relationships that we all know about, attorney-client, that sort of thing. In a debtor-creditor situation there is not a fiduciary relationship as a matter of law. North Carolina courts have said it's possible under proper situation where you can have a bank and customer relationship be a fiduciary relationship. They explore this in several different cases but one set more recently looked at is Dallaire v. Bank of America. This is a 2012 case coming out of the North Carolina Court of Appeals where the facts were that the bank may have attempted to give legal advice to a borrower before they entered into a loan. In that case the Court of Appeals said that summary judgment wasn't appropriate because there was a question of fact about whether or not a fiduciary relationship existed. But the case went up on appeal to the North Carolina Supreme Court and in 2014 the Supreme Court said that the transaction was at arm's length and it didn't give rise to a breach of fiduciary duty claim. Have the North Carolina courts ever recognized a fiduciary relationship between a borrower and a lender? They have not. Not yet. The case cited by the appellants in their brief is a Court of Appeals case from the state of California and it's from 1975. And in that case the Court of Appeals was looking at whether or not it was appropriate for the lower court to impose a protective order preventing a borrower from doing discovery as to the bank to try to explore whether or not there was a basis for a fiduciary relationship. That case was very extreme. The bank required the borrower company to hire a bank employee to come into the company and they were compelled, the court found, to surrender complete management control of the company to such an extent that the bank employee was able to overrule and supplant the board of directors and shareholders in its operation of the business. And in that situation they said this bank employee has basically become like a director of this company and now sits in a situation where they may have a fiduciary duty to their shareholders. So in that situation the court, as cited in the appellant's brief, didn't conclude that this relationship existed. It said it was appropriate for discovery to occur in order to look at that issue. But in North Carolina we have not seen that. But North Carolina courts do say that where you don't have a contractual fiduciary relationship, you do have to have confidence reposed on one side and you have to have domination and influence on the other. Was there any independent negotiation over who would manage this thing between the bank and Don and Falls? Or did Don and Falls just say, oh, okay, we'll take your guy? There's testimony from both sides and the testimony does differ. But where it does agree is that after the meeting between Mr. Vanderwood with the bank and Mr. and Mrs. Waffo, they did contact Mr. Gravitt and they did hire Mr. Gravitt. So there's no dispute about that. But they did independently negotiate that contract and enter into it. But that's what's in the record. The loan terms weren't agreed to until after that occurred? Yeah. Right. So they have already this purchase money mortgage with the buyer they found on their own and they refinanced the loan with the Nantahala Bank in February of 2008. Their initial meeting with Vanderwood to learn about Gravitt happened towards the end of 2007. So we know that. Now, there's nothing in the written documents the loan documents or the commitment letter that say anything about the Waffos being required to hire Mr. Gravitt. There is in the minutes the banks noting that there's a couple of factors that help them make their decision. And one is that they've hired a professional residential developer to help them do this, that being Mr. Gravitt. And that they're also highly capitalized. So those are the two factors the board's looking at in making a decision about whether or not to make this loan, which is the biggest loan this bank has ever made. So that was obviously pretty critical. Where does the loan stand now? The loan, because of the sales event where many, many, many lots were finally sold, it was paid down significantly to about 2.5 to 2.6 million. 4.8 And then they did default obviously and they filed bankruptcy. So everything is on hold. The land has not been foreclosed. If a place sells, a lot sells or a house sells in that development is the release price code to discharge the loan during the bankruptcy? So the Waffos entered into a final renewal of that note in June of 2011 and the release provision in there has been altered now to say it's a case by case basis. So there's not a hard and fast formula any longer. And I assume that the bankruptcy court would have to manage how that would be handled if a sale of a lot were to occur. For example, the Florida condo that's at issue in this case that is also collateral, it has been sold and the proceeds are sitting in trust while the bankruptcy court waits for this court to rule. By Mr. and Mrs. or by the trustee? It's being held by the trustee as I understand it. What's the fair market value of the remaining unsold lot? Well, we don't have a current appraisal. So I'm not entirely certain whether or not it would be enough to... It may still be underwater. Highly likely. The only other claims dealt with in the appellant's brief are fraud and negligent misrepresentation and unfair and deceptive trade practices. The district court you'll see deals with all the declaratory relief and those sorts of things are not mentioned though in the appellant's brief. And as to unfair and deceptive trade practices, again, we have some North Carolina law in Wachovia Bank and Trust versus Carrington which says that a bank exercising its rights under loan documents does not engage in unfair and deceptive trade practices. And I would argue that that is the case here that this bank is just acting appropriately under its own loan documents. And the fraud and negligent misrepresentation per the appellant's brief rests on the alleged misrepresentation that the bank would fund more money to these borrowers for the next phase of this development. But there is not any evidence to support that. That's it. Thank you.  I'd like to spend my last few minutes with you all talking about that fraudulent misrepresentation claim. It is true. So the appellants contended at the lower court that the bank fraudulently misrepresented to them that it would renew the note to provide additional advances to complete the project if the appellants placed an additional collateral of this Florida condo which was ultimately sold in the bankruptcy case. The district court granted the grounds. The district court first said that the record doesn't contain any forecast of evidence that such a statement was actually made. And the district court also said that the appellants have not presented any evidence to demonstrate that the bank had no intention of renewing the loan at the time the alleged representation was made. The district court did recognize under North Carolina law that a promissory representation which is a promise to do a certain act in the future that that can serve as a basis for a fraud claim if there's evidence of an intent to deceive. But we disagree with the district court about the evidence in the record. There is evidence in the record that demonstrates that the bank did tell the appellants that they would renew the note with additional advances to complete the development project if the Waffles agreed to pledge their Florida condo. What's the evidence that the So the evidence that the bank to answer your question, Judge, there is an internal credit memo by the bank's loan committee stated November 11th of 2010 which is at around the same time that the bank president made this representation to the Waffles that it would renew the loan in exchange for additional collateral where the bank said admittedly in the credit memo that the loan, that the additional collateral was not going to be used to fund additional advances but instead was taken to pay subcontractors money from the sales event that they were owed when the evidence shows that those subcontractors had actually already been paid. So that wasn't even true. But that's the evidence, Your Honor, that shows that the bank never intended to make additional advances to fund the completion of the development because by their own internal credit memo they indicated at around the same time this representation was made that the additional collateral was going to be used to pay subcontractors from the sales event when in truth those subcontractors had already been paid. The bank then changed its mind and said no, the additional collateral, the Florida condo is going to be taken to adequately capitalize the loan. That wasn't true either. The bank's most recent appraisal at that time showed that there was sufficient equity in the property such that it was already adequately capitalized. So it just leads you to believe that that's true then. So they took the Florida condo What was the worth of the value of that condo? I think at the time, Your Honor, it was around 1.7, 1.8 million in the bankruptcy case and I represent them in the bankruptcy case as well. We sold it for a little under 2 million. And it was unencumbered at the time. It was not collateral that was ever pledged originally for the loan. The bank tricked the Waffles. How much is being held in escrow? And I'm holding it, Your Honor, in escrow. I've got about 1.9 million. That's pretty good. Well, no, Your Honor, I mean the bank's claim with interest and expenses is over 3 million. Still pretty good. It's good to show that there was good value in the It doesn't look like this is a totally dead horse. I mean, it looks to me like there could be ways out with that money and future sales. The economy is starting to kick up, discretionary income. That's what we're hoping in the bankruptcy case. And also, lastly, Your Honors, the district court got it wrong also when they said there was no evidence in the record to support that that misrepresentation had been made. That's not true. There was an affidavit in the record by Miss Michelle Mosta, who was the property manager at the time, who actually witnessed the bank president make that representation to the Waffles that it would give them additional advances to fund the project in exchange for the Florida condo as additional collateral. The Waffles relied on that promise and went out and got surveys and did other stuff in reliance upon that promise. So the district court got it completely wrong when they said there was no evidence in the record to support the fraudulent misrepresentation claim. Alright. Thank you, Mr. Moore. Thank you. We'll adjourn court and come down and meet again.
judges: Paul V. Niemeyer, Barbara Milano Keenan, Andre M. Davis